**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**
**PITTSBURGH DIVISION**

| | | |
|---|---|---|
| Holy Trinity Ukrainian Catholic Church,<br><br>*Plaintiff,*<br><br>v.<br><br>Collier Township, Gabe Benvenuti, Wayne Chiurazzi, Tim Downey, Jr., Julie Murphy, Kari Suter, Dawnlee Vaughn, Mary Ann Cupples-Wisniowski,<br><br>*Defendants.* | ) | Case No. 2:26-cv-00024<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED COMPLAINT OF PLAINTIFF HOLY TRINITY UKRAINIAN CATHOLIC CHURCH**

Plaintiff Holy Trinity Ukrainian Catholic Church, by its undersigned attorneys at Troutman Pepper Locke LLP, Independence Law Center, and First Liberty Institute, files its Verified Complaint against Defendants Collier Township, Gabe Benvenuti, Wayne Chiurazzi, Tim Downey, Jr., Julie Murphy, Kari Suter, Dawnlee Vaughn, and Mary Ann Cupples-Wisniowski, and says as follows:

**PRELIMINARY STATEMENT**

Holy Trinity Ukrainian Catholic Church (the "Church") is a small Ukrainian Catholic parish founded in Collier Township, Pennsylvania (the "Township"). The Church is part of a small branch of the Catholic Church, headquartered in Ukraine, which worships according to traditions that originated millennia ago in Eastern Europe. But in the mid-twentieth century, these traditions faced brutal persecution and oppression by Joseph Stalin, to the point that the Ukrainian Catholic Church

became the largest persecuted religious organization in the world until the 1980s. Facing oppression under Soviet rule, Ukrainian Catholic refugees found respite in communities like the Church's parish. Those refugees joined with local parishioners to worship in peace according to their shared customs and traditions.

To support the worship of its members, the Church acquired a 41-acre parcel (the "Property") and, beginning in the 1950s, transformed it into a cemetery to honor its dead. By 2023, the Church was ready to expand the use of its Property in service of its religious mission: the Church would construct a chapel and related facilities where its members and other Ukrainian Catholics could pray and worship according to their liturgical tradition. This project would have attracted followers from around the world to celebrate—at last, Ukrainian Catholics not only had the freedom to worship, but also a place where they could come together to do so.

But the Township thwarted these plans. To begin, the Township's zoning ordinances deny any church the right to construct a church building anywhere without obtaining a conditional use approval. Yet, the Township permits numerous other property uses as of right, including kennels, motels, business or professional offices, horticulture, pet services, and car washes. So the Church applied for rezoning and a conditional use approval; the Township refused to approve anything but a shadow of the Church's plans for its own Property. In fact, the Township attached to its "approval" a list of bizarre and unlawful restrictions on the Church's worship, including how long and when the Church could ring bells and for whom the Church could hold memorial services. The Township made no effort to identify any compelling

governmental interests motivating its micromanagement of the Church's liturgical life, nor do any exist.

Further, the Township rejected the Church's plans for the Property and imposed these restrictions notwithstanding that, less than a mile up the road, the local carpenters union maintains a 19-acre campus consisting of a 93,000-square-foot complex of buildings, including classrooms, conference rooms, offices, a cafeteria, an event space, a 150-seat auditorium, a 4,000-square-foot meeting room with seating for 400 people, and around 300 parking spaces; notwithstanding that the Property sits in the flight path of the Pittsburgh International Airport where commercial airliners coming to and from the airport roar overhead every day; and notwithstanding that the Township permitted construction of around 200 homes in a nearby neighborhood development.

Congress acted decades ago to prevent exactly what the Township has done here. In the 1990s, Congress recognized a troubling trend: local governments, through zoning codes and land use regulations, "frequently discriminat[ed]" against churches, "and [against] new, small, or unfamiliar churches in particular." 146 Cong. Rec. S7774 (daily ed. July 27, 2000).[1] To address this issue, Congress enacted the Religious Land Use and Institutionalized Persons Act (RLUIPA). *See* 42 U.S.C. § 2000cc *et seq.* RLUIPA's mandate is simple—the government may not "impose or implement a land use regulation in a manner that imposes a substantial burden on the religious

[1] Available at https://www.govinfo.gov/content/pkg/CREC-2000-07-27/html/CREC-2000-07-27-pt1-PgS7774.htm (all webpages last visited Jan. 6, 2026).

exercise of a person, including a religious assembly or institution" unless the government identifies such burden is the "least restrictive means" of advancing a "compelling governmental interest." *Id.* § 2000cc(a). Nor may the government treat religious land use "on less than equal terms with a nonreligious assembly or institution." *Id.* § 2000cc(b)(1).

The Township has blatantly violated RLUIPA and the U.S. Constitution here. First, the Township's zoning ordinances facially discriminate against religious land use by denying the Church the right to construct a church building anywhere within the Township as of right. Next, in rejecting the Church's proposals and attaching strict conditions to the Church's use of its Property, the Township has used zoning ordinances to impose a substantial burden on the Church's religious exercise. To do so, the Township needed to identify a compelling interest justifying its burdens and use the least restrictive means to further that interest. It failed to do either. The Township failed to identify any compelling governmental interest—or any interest *at all*—in denying the Chruch's plans for use of its own Property. And it failed to calibrate the use restrictions it did impose in any way, much less ensure they were the least restrictive means available. The Township's conditions are not only arbitrary and discriminatory but also highly restrictive impositions on the Church's religious life, which cannot satisfy RLUIPA or the First Amendment. This lawsuit seeks redress for the Township's actions, which have strangled the Church's ability to practice its religion without even considering obligations under RLUIPA or the First Amendment.

## PARTIES

1. Plaintiff Holy Trinity Ukrainian Catholic Church is a Ukrainian Catholic Church located at 730 Washington Ave, Carnegie, PA.

2. Defendant Collier Township is a township in Allegheny County, Pennsylvania.

3. Defendant Gabe Benvenuti is an individual who served as a commissioner on the Collier Township Board of Commissioners in 2024 and 2025. Benvenuti is sued in his official and individual capacity.

4. Defendant Wayne Chiurazzi is an individual who served as a commissioner on the Collier Township Board of Commissioners in 2024 and 2025. Chiurazzi is sued in his individual capacity.

5. Defendant Tim Downey, Jr., is an individual who currently serves as a commissioner on the Collier Township Board of Commissioners since January 5, 2026. Downey, Jr., is sued in his official capacity.

6. Defendant Julie Murphy is an individual who currently serves as a commissioner on the Collier Township Board of Commissioners since January 5, 2026. Murphy is sued in her official capacity.

7. Defendant Kari Suter is an individual who served as a commissioner on the Collier Township Board of Commissioners in 2024 and 2025. Suter is sued in her individual capacity.

8. Defendant Dawnlee Vaughn is an individual who served as a commissioner on the Collier Township Board of Commissioners in 2024 and 2025. Vaughn is sued in her official and individual capacity.

9. Defendant Mary Ann Cupples-Wisniowski is an individual who served as a commissioner on the Collier Township Board of Commissioners in 2024 and 2025. Cupples is sued in her official and individual capacity.

## JURISDICTION

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the First and Fourteenth Amendments to the United States Constitution. *See* 42 U.S.C. § 1983; 42 U.S.C. §§ 2000cc *et seq.*

## VENUE

11. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendants reside in the Western District of Pennsylvania.

12. Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in the Western District of Pennsylvania.

## FACTUAL BACKGROUND

### I. History of the Church and Its Place in Collier Township

#### A. The Ukrainian Catholic Church

13. The Catholic Church is the world's largest Christian church, with more than a billion members worldwide. Although the Latin (or "Roman") Catholic Church is most familiar to the majority of Americans, the Catholic Church is divided into twenty-four autonomous churches: the Latin Church and twenty-three "Eastern" Catholic Churches. The Eastern Catholic Churches trace their origins to Christian practices that arose not in Western Europe, but in the Middle East, North Africa, East Africa, Eastern Europe, and South India. Despite their different liturgical

patrimony, the Eastern Catholic Churches remain in union with the Bishop of Rome, also known as the Pope, and with the Latin Church. This distinguishes them from the Orthodox Churches, which have similar origins but are no longer in union with the Latin Church.

14. While there are nearly 1.3 billion Catholics in the world, Eastern Catholics comprise less than two percent of the global Catholic community.

15. The Ukrainian Greek Catholic Church, based in Ukraine, is one of the twenty-three Eastern Catholic Churches. At around fifty thousand members, Ukrainian Catholics are a tiny minority in the United States, as compared to more than sixty million Roman Catholics.

16. In the twentieth century, the Soviet Union harshly repressed the Ukrainian Catholic Church. Joseph Stalin viewed Ukrainian Catholics as less likely to submit to Soviet rule, so he declared the Ukrainian Catholic Church and its property to be forcibly "absorbed" into the Soviet state-run Russian Orthodox Church.

17. As a result, it was effectively illegal to practice Ukrainian Catholicism under Soviet rule. Ukrainian Catholics "went underground," praying and worshipping according to their traditions in secret.

18. The Ukrainian Catholic Church became the largest persecuted religious organization in the world. At the very least, Ukrainian Catholics faced losing their social status, as well as professional and educational opportunities. This period of Stalinist repression produced martyrs and dissidents who, rather than forsake their

religion, endured punishments including arbitrary imprisonment, Siberian exile, interment in forced labor camps (gulags), and torture.

19. Many persecuted Ukrainian Catholics and their descendants fled to the United States (among other places). Some of those faithful settled in established Ukrainian Catholic parish communities, like the Holy Trinity Parish in Carnegie, Pennsylvania.

20. Soviet persecution of Ukrainian Catholics finally ended in 1989 as Soviet Premier Mikhail Gorbachev's policies permitted greater civil liberties in the waning years of the U.S.S.R.

21. A century of repression has led to Ukrainian Catholicism struggling to maintain its heritage. Pope Leo XIV remarked recently that years of persecution and poverty risked "the priceless heritage of the Eastern Churches [ ] being lost."

**B. Eastern Catholic Traditions and Beliefs**

22. The Ukrainian Catholic Church is in full communion with the Latin Church, meaning, among other things, that it shares the theological beliefs of the Latin Church. Pope John Paul II referred to Eastern Catholicism and Roman Catholicism as the "two lungs" of the Catholic Church.

23. Still, the Ukrainian Catholic Church, like other Eastern Catholic Churches, follows distinct Eastern traditions and liturgies.

24. Ukrainian Catholic churches often ring bells, particularly during memorials, holy days, and church services. Bells serve as a reminder to pray; the bell is both a musical instrument and a "communicator," accompanying both joyous and solemn moments within a parish.

25. To respect the hour of Jesus Christ's death, Catholics offer a prayer at 3:00 p.m. A religious tradition of Ukrainian Catholic churches is to ring bells to commemorate this "divine hour of mercy."

26. Ukrainian Catholicism also places great emphasis on commemorating the dead as part of its religious practice and devotion. Remembering and praying for the dead is a regular part of every Ukrainian Catholic Divine Liturgy. Additionally, while many Christians celebrate a single All Souls' Day on November 2, Ukrainian Catholics celebrate multiple All Souls' Saturdays throughout the year. During these commemorations, Church members "recite the names of all the faithful departed who have been particular[ly] remembered by the faithful of the parish."

27. Another hallmark of the Ukrainian Catholic Church is its distinct architectural style, which includes domes—often gilded in gold—crowning the churches instead of the steeples common to Western Christian architecture, along with distinctly shaped and proportioned sections. Ukrainian Catholics view this "Kyivan" style as central to the expression of their religious heritage.

**C. The Church's History in Collier Township**

28. The Ukrainian Catholic Church is divided into geographical jurisdictions called Eparchies. The Church is part of the Ukrainian Catholic Eparchy (or diocese) of St. Josaphat, which is located in Parma, Ohio, under the leadership of Bishop Bohdan Danylo. The Church in the Township has a registered membership of approximately 225 households.

29. The Church traces its roots in the area to the late nineteenth century, when Eastern European migrants came to the area to work in the steel mills and mining industry and formed a parish.

30. In the 1940s, members of the parish disagreed as to whether to remain a Catholic church or to become an Orthodox church.

31. This disagreement led to an ownership dispute that made its way to the courts. As a result, the Catholic contingent lost ownership of the parish church.

32. These Catholic members then formed the current Church, which would later acquire the "Trinity Acres" Property in the Township in 1953.

33. Father Jason Charron is the current pastor and leader of the Church.

**D. The Church's Property in Collier Township**

34. The Church owns a 40.6-acre Property in the Township, shown below.

35. The Property includes land zoned Planned Economic Development District ("PEDD") and Rural Residential District ("R-1").



36. The Property contains a small mausoleum, which houses three tombs of several founding leaders. The Mausoleum is surrounded by a small cemetery.









37. In addition to this Property, the Church owns a place of worship located at 730 Washington Avenue, Carnegie, PA 15106.

**E. Properties Adjacent to the Church's Property**

38. Adjacent to the Church's Property are Pittsburgh International Airport (the "Airport") to the northwest and Interstate 376, a major highway, to the north.

39. The Airport is located about twelve miles northwest of the Church. Hundreds of flights go through the Airport each day, carrying passengers, cargo, and mail. The ground-level noise produced by a commercial airliner flying above the Church and the surrounding area can range from 45 decibels (dB) to more than 100 dB.[2]

[2] The United States Department of Transportation ("USDOT") publishes a "National Transportation Noise Map," an interactive online map that shows noise levels from




40. Additionally, the Church and the abutting neighborhood sit just south of I-376, a major highway.




various sources, including airplanes and road traffic. Noise data available at https://maps.dot.gov/BTS/NationalTransportationNoiseMap/.

41. The USDOT Noise Map shows that I-376 produces around 45–50 dB near the Property, with the noise becoming more intense the closer one gets to the highway.

42. Thus, those living around the Property hear the constant hum of traffic on a major highway, as well as the roar of commercial airliners flying overhead every day.




43. There are around twenty-two churches in the Township. It is not evident whether the Township also choked their religious exercise through administrative delays and severe restrictions.

44. One such church is the Hill City Church Headquarters located at 307 Merchant Lane, Carnegie, PA 15106. This property is also located in a PEDD zone.

Despite the Township's prohibition on churches in PEDD zones, Hill City Church still worships and operates there.

45. To the west of the Property, a neighborhood development called "Centennial Point" contains about 225 single-family homes, ranging from around 1,696 to 3,360 square feet.[3] Centennial Point was developed beginning in the late 2010s.

46. Another property adjacent to the Property is a large complex (the "Carpenters Complex"). The Carpenters Complex occupies 19 acres located less than a mile from the Property on Ridge Road, which also runs along the Property. *See* E. Atl. States Reg'l Council of Carpenters, *Meet Pennsylvania.*[4]

47. The Carpenters Complex has been operating since around 2010. *See Project Profile: Carpenters Joint Apprentice Training Committee Center*, Breaking Ground, Nov.–Dec. 2010, at 28.[5]

48. It includes approximately 92,500 indoor square feet, including a "comprehensive training" space used for carpentry training programs, event space available to the public at cost, a large cafeteria, multiple classrooms, a board room, offices, and an auditorium with theater-style tiered seating for 150 people. The Complex also contains about 300 parking spaces.[6]

---

[3] Available at https://www.livabl.com/carnegie-pa/centennial-point.
[4] Available at https://www.eascarpenterstech.edu/pennsylvania/meet-pennsylvania/.
[5] Available at https://www.mbawpa.org/assets/files/past-issues/BGNovDec.pdf.
[6] The Complex even offers a virtual tour of its large campus.
*See* https://carpenterslive.org/ Tours/.

49. The Carpenters Complex also houses Local 432, which touts itself as having "4000 plus members" and claims to be "the largest carpenter Local in the State of Pennsylvania and the second largest in the Eastern Atlantic States Regional Council of Carpenter's seven States."[7] The Greater Pennsylvania Regional Council of Carpenters owns the Carpenters Complex. *See General Information, 650–652 Ridge Rd., Pittsburgh, Pa 15205*, Allegheny Cnty. Real Estate Portal.[8]

50. To house Local 432's activities, the Carpenters Complex added a 4,000-square-foot Regional Council Building capable of seating 400 people in 2020.[9]

51. Upon information and belief, the Council Building began hosting Local 432's monthly meetings in January 2021 and continues to host those monthly meetings as of the date of this filing.

52. Prominent politicians, from former president Joe Biden to sitting United States senators, have used the Carpenters Complex to host large rallies.[10]

---

[7] Available at https://www.local432.org/

[8] Available at https://realestate.alleghenycounty.us/GeneralInfo?ID=0264H00006000000.

[9] Available at https://www.local432.org/incapable-of-drawing-a-single-stroke-at-the-present-moment/

[10] *See, e.g.*, Arlette Saenz, *Joe Biden Campaigns with Democrat Conor Lamb in Pa. Special Election*, ABC NEWS (Mar. 7, 2018), https://abcnews.go.com/Politics/joe-biden-campaigns-democrat-conor-lamb-pa-special/story?id=53551939; *Dozens of Essential Workers Rally Before President Joe Biden's Collier Township Visit*, CBS NEWS (Mar. 31, 2021), https://www.cbsnews.com/pittsburgh/news/president-joe-biden-rally-collier-township/; Kiley Koscinski, *U.S. Senate Candidate Arkoosh Talks Union Jobs, Infrastructure with KML Carpenters in Pittsburgh*, 90.5 WESA (July 16, 2021), https://www.wesa.fm/politics-government/2021-07-16/u-s-senate-candidate-arkoosh-talks-union-jobs-infrastructure-with-kml-carpenters-in-pittsburgh; Ashley Zilka, *Fetterman Holds Final Rally in Pittsburgh on Election Eve*, WTAE (Nov. 8, 2022), https://www.wtae.com/article/john-fetterman-final-senate-campaign-rally-pittsburgh/41893332; Kim Lyons, *Jill Biden Touts 'Bidenomics' in Pittsburgh Stop*,

53. Just like the Church, the Carpenters Complex is located in a PEDD zone and is only accessible via Ridge Road. Photos of the Carpenters Complex are below:







PENNSYLVANIA CAPITAL-STAR (July 18, 2023), https://penncapital-star.com/government-politics/jill-biden-touts-bidenomics-in-pittsburgh-stop/; *Shapiro Administration Celebrates Earn-As-You-Learn Success Stories*, E. ATL. STATES REG'L COUNCIL OF CARPENTERS (Mar. 13, 2024), https://eascarpenters.org/shapiro-administration-celebrates-earn-as-you-learn-success-stories/; *Senators Casey and Klobuchar Hold Event at Eastern Atlantic States Regional Council of Carpenters' Pittsburgh Training Center*, E. ATL. STATES REG'L COUNCIL OF CARPENTERS (Oct. 7, 2024), https://eascarpenters.org/senators-casey-klobuchar-carpenters-pittsburgh-training-center/.


Pittsburgh Training Cent...
WARD


CARPENTERS
TRAINING CENTER


Trimble

54. Beyond the construction of Centennial Point and the Carpenters Complex, the Township appears poised for future development in the area near the Church's Property.

55. The Township's Targeted Areas for Investment Map designates two wooded areas adjacent to the Church's Property as "Future Mixed Use Development."[11]







56. One of these wooded areas is adjacent to the nearby neighborhood.

---

[11] Available at https://storymaps.arcgis.com/stories/f4a2a7dcdbd346e492c182b57392b8ac.

## II. The Township's Zoning Ordinances

57. The Township's zoning ordinances are codified in Chapter 27 of its Municipal Code.

58. Under the Township's zoning ordinances, churches are prohibited from operating in any zone except for the R-1, R-2, R-2-A, R-3, and R-4 zones. Twp. of Collier, Pa., Mun. Code § 27, Attachment 9, Use Table.[12] Even within those zones, churches are required to obtain conditional use approval from the Township to operate. *Id.* Thus, the Township does not permit churches to operate as a matter of right anywhere within its jurisdiction.

59. Likewise, the Township restricts cemeteries to operating within two zones: R-1 and PEDD. *Id.* As with churches, the Township does not permit cemeteries to operate as a matter of right anywhere within its jurisdiction; instead, it always requires cemeteries to obtain conditional use approval from the Township. *Id.*

60. Notwithstanding these restraints on churches and cemeteries, the Township permits secular uses such as commercial schools, minor and major business and professional offices, health clubs, commercial recreational uses, private recreational uses, public recreational uses, indoor entertainment venues, and restaurants to exist as a matter of right in at least one of the Township's zoning districts. *See id.*

61. The Township's zoning code states that a "'minor business or professional office' shall be one that has a gross floor area of less than 10,000 square

---

[12]Available at https://ecode360.com/attachment/315126/CO2581-027i%20Use%20Table.pdf.

feet" and that a "'major business or professional office' shall be one that has a gross floor area of 10,000 square feet or more." *Id.* § 27-202 Business or Professional Office. For example, companies such as CDI Office Technologies, Securitas Technology, and Cardel-Criste operate offices in PEDD zones within the Township.

62. The Township's zoning code defines a health club to mean "[a] commercial recreational enterprise or private club which has as a principal use a gymnasium, swimming pool or other sports facility and which may offer massages, whirlpool baths, steam rooms, saunas and/or medical facilities as accessory uses to the principal use." *Id.* § 27-202 Health Club.

63. The Township's zoning code defines commercial recreational uses to mean "[a]n indoor or outdoor establishment operated by a profit-making corporation, partnership or other business entity for the pursuit of sports and recreational activities, available to the general public for a fee, including, but not limited to, such establishments as miniature golf, golf or batting practice facilities, ice or roller rinks, playing fields, racquet clubs, fitness centers, swimming pools, amusement parks, amphitheaters and similar facilities." *Id.* § 27-202 Recreation, Commercial.

64. The Township's zoning code defines private recreational uses to mean "[a]n enterprise operated by an individual or nonprofit association or corporation, other than a public entity, for the pursuit of sports and recreational activities, which may be advertised to the general public, but the use of which is limited to members and their guests, including, but not limited to, such establishments as country clubs,

golf courses, sportsman's club, golf practice facilities, playing fields, tennis or racquet clubs, swimming pools and similar facilities." *Id.* § 27-202 Recreation, Private.

65. The Township's zoning code defines public recreational uses to mean "[a]n enterprise owned and operated by a public entity, available to the general public, whether or not an admission fee is charged, including either indoor or outdoor facilities for the pursuit of sports, recreation or leisure activities, including, but not limited to, parks, playgrounds, playing fields, golf courses, golf or batting practice facilities, ice rinks, tennis courts, swimming pools and similar facilities." *Id.* § 27-202 Recreation, Public.

66. The Township's zoning code defines indoor entertainment venues to include "[a]n establishment operated by a profit-making corporation, partnership or other business entity, located within a completely enclosed building, as defined by this chapter, for the pursuit of cultural performances and entertainment activities, including, but not limited to, theaters (live and motion picture), arenas, bowling alleys, pool halls, virtual reality and simulation gaming parlors, video arcades, dance halls and similar facilities." *Id.* § 27-202 Indoor Entertainment.

67. Thus, the Township's zoning code allows a variety of secular activities to exist as a matter of right in one or more of its zoning districts while denying churches an equal right to exist as a matter of right.

68. Specifically, within the PEDD zones, the Township's zoning ordinances permit commercial schools like the Carpenters Complex to exist and operate as a matter of right. *Id.* § 27-1602.1. They also permit minor and major businesses and

professional offices, health clubs, private recreational uses, public recreational uses, and commercial recreational uses to exist and operate as a matter of right within the PEDD zones. *Id.* § 27-1602.1. The Township permits, for instance, C&M Prep (a preschool) and C&M Play Studio (a daycare) to operate in a PEDD zone, even though "preschool facility" is not listed as an approved use.

69. Despite this bevy of comparable secular uses that the Township's zoning ordinances allow to operate as a matter of right within the PEDD zones, the Township prohibits churches and other religious institutions from operating in the PEDD zones at all. *Id.* § 27, Attachment 9, Use Table.

70. As previously noted, however, the Township allows Hill City Church to operate within a PEDD zone, and it is apparent from Hill City Church's publicly advertised activities that the Township has not placed similar restrictions on Hill City Church.[13]

71. The only potentially religious land use contemplated by the Township in the PEDD zone is to operate a cemetery, but even that use is not allowed as a matter of right and is instead subject to conditional use approval from the Township. *Id.* § 27-1602.1–.2.

72. The Township's purpose of the PEDD zones is "to promote economic development on large undeveloped tracts in a campus-style atmosphere, allowing for a compatible mix of uses that encourages an integrated living and working

[13] Available at https://www.hillcitypgh.com/.

environment while preserving adequate buffers between dissimilar uses." *Id.* § 27-1601.

73. The establishment of a church campus, including memorials or cemeteries, is consistent with the Township's stated objective of establishing a "campus-style atmosphere" that allows a "mix of uses that encourages an integrated living and working environment." *See id.*

74. Notwithstanding this consistency, the Township's zoning ordinances prohibit churches from operating in the PEDD zones while permitting commercial schools, businesses, professional offices, health clubs, amusement parks, amphitheaters, fitness centers, ice or roller rinks, and country clubs as a matter of right.

## III. The Church's Proposed Shrine Project

75. In 2023, the Church began to develop a plan to use the Property—much of which is empty land—to serve the Church's membership and its broader religious mission. Specifically, the Church sought to construct a shrine on its Property dedicated to the Holy Protection of the Mother of God in the architectural style of the Ukrainian Catholic Church (the "Shrine Project").

76. As envisioned by the Church, the Shrine Project would include construction of an approximately 13,000-square-foot chapel (less than 15% the size of the nearby Carpenters Complex) housing a sanctuary, social hall, museum crypt, gift shop, and a small retreat center with 18 guest rooms. The Shrine would also feature spires and a bell tower in the Kyivan style of the Ukrainian Catholic Church.

77. The Shrine was intended to honor Mary, the Mother of God, and serve as a place where Ukrainian Catholics might come to pray and worship.

78. Before bringing the Shrine Project to the Township, the Church invested significant resources and time to develop and plan the project. Specifically, the Church (through an associated non-profit foundation) spent more than $160,000 on design and site development efforts, including site plans, site visits, interior chapel design to meet liturgical needs, geotechnical investigations, drilling operations, and stormwater analysis. The Church engaged architects, builders, and engineers to analyze and plan the project.

79. In October 2023, Church representatives and contractors held an informal meeting with the Township's Director of Planning, Zoning & Land Development, Bob Caun. At that meeting, Caun provided feedback and recommendations on the Shrine Project with no pushback.

80. By the time the Church submitted its application to the Township, the Shrine Project had been meticulously considered and planned.

### A. The Church's Application for Rezoning and Conditional Use

81. In December 2023, the Church submitted a six-page application to the Township's Planning Commission to seek zoning approvals to bring its vision to life.

82. The Church's fulsome application included a narrative explaining the vision for the Shrine Project and specific proposed amendments to the Township's zoning ordinances and zoning map to accommodate the unique planned cultural uses. The proposed amendments contained a high level of detail, even addressing buffer areas, traffic studies, lighting plans, photometric plans, and height limitations.

83. Specifically, the Church's application sought to rezone 9.4 acres of its Property currently zoned R-1 to PEDD. This rezoning would make the northern 30 acres (to be used for the construction of the Shrine Project) PEDD-zoned, while the remaining southern 11.6 acres would stay R-1-zoned and serve as the cemetery for the Church.

84. To build its planned Shrine Project, the Church also determined it would need to amend the current PEDD zones to allow for the "conditional use" of a "Planned Cultural Center."

85. But even before this amendment, in a PEDD-zoned area, the Church was authorized to pursue principal uses like a "commercial school," a "major business or professional office," an amusement park, or a country club. Twp. of Collier, Pa., Mun. Code § 27-1602.1. Additionally, if permitted by the Board of Commissioners, the area allows for accessory uses such as a "hospital," "hotel or motel," "planned office or research park," "planned recreation complex," or "private-use helipad." *Id.* § 27-1602.2.

86. After submitting the application, the Church continually expressed a willingness to work with the Planning Commission and Board of Commissioners.

**B. The Township Rejects the Shrine Project**

87. On January 9, 2024, the Church's builder and architect presented the Shrine Project to the Planning Commission. This presentation included specific proposals for the amendments to Township zoning as well as detailed designs and renderings of the planned construction. During this meeting, the Planning Commission requested additional information but demonstrated general acceptance

and enthusiasm. At this point, the Township showed no major red flags of resistance to the Shrine Project.

88. The Allegheny County Economic Development agency similarly showed no signs of resistance. In a February 6, 2024 letter, the agency reviewed the application in accordance with the Pennsylvania Municipalities Planning Code. In that letter, the agency simply identified procedural requirements for the Planning Commission to keep in mind. The letter did not include negative feedback or resistance to the Shrine Project.

89. For six months, the Church's representatives answered questions and explained the spiritual importance of the Shrine Project for the Planning Commission to the Church.

90. During these meetings, there was no discussion of how RLUIPA's standards applied to the Shrine Project. The Township did not articulate any compelling governmental interests, nor did it even attempt to assess whether denying the Shrine Project would be the least restrictive means of furthering such interests, if they existed.

91. Instead, the Township arbitrarily asked the Church to answer questions about (1) the number of visitors to the Shrine; (2) decibel noise from the bell tower; (3) height of the bell tower; (4) and potential occupancy for retreats. For each issue, the Church continued to provide information and concessions.

92. Specifically, on May 14, 2024, when the Planning Commission asked parking and traffic questions, the Church's pastor, Father Jason Charron, explained

that he did not want the Township taxpayers to pay for any road infrastructure and proposed that the Church could raise the money to resolve potential economic impact related to any necessary road infrastructure work. Additionally, a traffic consulting company explained its review of the Property for parking and traffic issues.

93. Without consideration of the substantial burden that a denial would cause the Church's religious exercise or considering available alternatives, the Planning Commission voted to deny the Church's application. The Planning Commission commented that it was concerned with potential "economic hardship and inconveniences" to residents (which it failed to articulate or explain) and that the Church's concept was "fabulous," but the location was not right. **Exhibit A** (May 14, 2024 Minutes of the Collier Township Planning Commission Regular Meeting).

94. This decision was not accompanied by any findings or based on specific testimony or other evidence to weigh such alleged hardship or inconvenience against the substantial burden that would be placed on the Church. After this denial, the Church requested a public hearing with the Board of Commissioners.

95. Ahead of the September 9, 2024 public hearing, a petition was circulated around the community to oppose the Church's application. Then, at the hearing, several community members expressed hostility to the religious nature of the Shrine Project. During the hearing, Chairman and Commissioner Chiurazzi asked Father Charron how the Church intended to finance the Shrine Project. Father Charron replied that the Church would rely on God's providence and the generosity of donors. Many attendees of the hearing burst into open laughter.

96. After the public hearing, the Board of Commissioners also denied the Church's application. Like the Planning Commission, the Board of Commissioners' decision does not reflect any effort to evaluate whether denial would impose a substantial burden on the Church, identify compelling government interests that would support its decision, or assess whether denial of the project entirely was the least restrictive means of achieving any legitimate interest *at all*.

### C. The Church's Post-Denial Efforts to Work with Collier Township on a Scaled-Down Application

97. In the months following this rejection, the Church, seeking to be a good neighbor, considered how to move forward while still enabling it to make use of the Property and ultimately, in December 2024, submitted a significantly scaled-down application (the "Chapel Project").

98. The new application only sought approval to use PEDD-zoned land as a cemetery use and to build a chapel and mausoleum on that cemetery.

99. Over the following months, the Planning Commission requested more information, including pictures, approximate size, and a narrative of activities to be conducted for the chapel, as well as the proposed decibel and frequency of the chapel's bells. In addition to providing this information, the Church continued to discuss further concessions for the Chapel Project, including how the Church could resolve raised concerns surrounding traffic, adjacent road condition, bell tower height, and bell tower noise.

100. The Church presented the scaled-down Chapel Project to the Board of Commissioners. Chairman Chiurazzi again asked Father Charron how the Church

intended to finance the Chapel Project. Before Father Charron could speak, Chairman Chiurazzi mockingly chided, "Please don't tell me *Jesus* is going to pay for it."

101. On June 10, 2025, the Planning Commission issued a formal letter to the Church "approving" the Church's Chapel Project with 8 additional conditions:

a. The structure is considered an Accessory Structure.[14]
b. The size of the chapel/mausoleum shall be less than or equal to 5000 square feet.
c. Fire Hydrants shall be installed and located as per the recommendation of the Township Fire Officials.
d. Ringing of bells / chimes shall be limited to 3-1/2 minutes in duration and shall not be before 9:00AM and shall be limited to funerals and/or memorial services only.
e. Memorial Services shall be held only for those persons deceased after June 9, 2025.
f. The maximum height of the chapel/mausoleum shall be not more than two stories and not greater than 35 feet to the highest point on the building, inclusive of all attachments and/or building components.
g. The chapel/mausoleum shall only be used for funeral and/or memorial services, no other functions or gatherings shall be permitted.
h. The Township reserves the right to audit usage with 30-days' notice.

**Exhibit B** (June 10, 2025 Conditional Use Application "Approval" Letter).

102. Not only were these numerous and arbitration restrictions unlawful efforts to micromanage the Church's liturgy and worship, but they also effectively

[14] In April 2025, the Township retained a law firm to evaluate the Church's request to construct a chapel in the Church's cemetery property. The resulting Legal Memorandum was delivered to the Church by a Planning Commission member. **Exhibit C** (April 22, 2025 Legal Memorandum). The Memorandum concludes that the Church's cemetery is the principal structure, so the proposed chapel must be an "accessory structure." This categorization would reduce the maximum height of the Chapel from the proposed 65 feet down to 20 feet.

amounted to another denial. And again, the Planning Commission entirely failed to evaluate any of RLUIPA's elements in reaching its decision.

## IV. Collier Township is Imposing a Substantial Burden on the Church's Religious Exercise

103. Through a multi-year process—replete with applications, meetings, hearings, and continued additions of ever-more limiting conditions—the Township shrunk the Church's Shrine Project to a shell of the original proposal.

104. The Church made good faith efforts to accommodate the Township's concerns. But where the Church gave an inch, the Township took a mile, ultimately refusing to permit the Church to proceed with anything that will meet its needs.

### A. Substantial Burdens

105. The size, height, and building type restrictions the Town purports to impose are substantial limitations. The Church has long sought to use the Property as a location for pilgrimage for Ukrainian Catholics, who are a tiny minority in this country and have few, if any, comparable places of pilgrimage available.

106. The Township's conditions purport to limit bell-ringing to 3.5 minutes in duration and only allow bell-ringing for funerals or memorial services. Under this restriction, the Church could not even ring bells during its Divine Liturgies at the proposed chapel on the Property. Nor could it ring its bells to commemorate the 3:00 p.m. Hour of Mercy, another regular religious observance of the Church, nor to commemorate holidays or to remind its followers to pray. The Township has thus substantially burdened the Church's ability to practice an essential element of its faith.

107. The Township's conditions purport to limit memorial services to "persons deceased after June 9, 2025." By preventing the Church from holding memorial services for those who died before this date, the Township prevents the Church from properly honoring its founders and congregants (many of whom are currently buried on the Property) and from honoring loved ones lost before this arbitrary date. On All Souls' Saturdays, the Church honors *all* those who have died, even those who died before June 9, 2025. This condition prevents the Church from doing so. The Township has thus substantially burdened the Church's ability to follow a central tradition of honoring the dead, regardless of when they died.

108. The Township's conditions purport to prevent the Church from using its proposed chapel for anything other than funeral or memorial services. Church members would be unable to gather to pray, worship, observe, or otherwise honor their religious traditions.

109. The Township's purported right to "audit usage" is also a substantial burden and violation of the Free Exercise and Establishment Clauses of the Federal Constitution. The First Amendment guarantees the Church the right to worship free of governmental interference, including purported "audits" to assess, for example, whether the Church exceeded its 3.5-minute bell-ringing allotment.

**B. No Compelling Interest**

110. The Township lacks a compelling interest in preventing churches from operating anywhere as of right. Ordinances like those here are the exact reason Congress passed RLUIPA.[15]

111. The Township not only failed to articulate a compelling interest for its restrictions, but it failed to articulate *any interest at all* in rejecting the Church's plans for use of its Property.

**1. Noise**

112. Township officials expressed concern in 2024 about potential noise produced by ringing church bells. The Township does not have a compelling interest in minimizing the noise of the church bells, as much more disruptive sources of noise already exist in the area, including from the Airport and Interstate 386.

113. Church representatives assured the Township that bell-ringing would comply with the Township's noise ordinance, as well as "mirror whatever the existing frequency and decibel level is at other Catholic cemeteries in" the Township. Despite these assurances, the Township continued to press the noise issue.

114. In its conditional approval, the Township limited the permissible ringing of bells in two significant ways.

115. First, the Township limited the ringing of bells to 3.5 minutes.

---

[15] *See* 146 Cong. Rec. S7774 (daily ed. July 27, 2000), *supra* note 1 ("Zoning codes frequently exclude churches in places where they permit theaters, meeting halls, and other places where large groups of people assemble for secular purposes. Or the codes permit churches only with individualized permission from the zoning board, and zoning boards use that authority in discriminatory ways.")

116. Second, the Township limited the ringing of bells to funerals and memorial services only.

117. The result of these restrictions is that the Church cannot ring bells during its services, to remind followers to pray, or to commemorate the daily hour of mercy at 3:00 p.m.

118. The pretext for these restrictions appears to be that bells would be loud and disruptive. But church bells would add minimally to the noise that the area already experiences. And unlike the constant noise from the Airport and interstate, bells ring only periodically (at a decibel level and for a duration that complies with the relevant noise ordinance).

**2. Traffic Management and Road Safety**

119. The Township expressed concern about "traffic management." The Township can assert no compelling interest in reducing traffic on or ensuring the safety of Ridge Road, given Ridge Road's existing uses and the steps the Church has taken to address this issue.[16]

120. The Church commissioned Wooster & Associates Traffic Consultants to conduct a Parking Demand Analysis (the "PDA"). The PDA determined that the completed Shrine Project would not impact the nearby intersections.

---

[16] *See id.* ("More often, discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or 'not consistent with the city's land use plan.' Churches have been excluded from residential zones because they generate too much traffic, and from commercial zones because they don't generate enough traffic.")

121. Josh Haydo, a senior staff engineer for Wooster & Associates, testified at the May 14, 2025, Planning Commission meeting. Mr. Haydo testified that "Ridge Road as is will be able to handle the amount of traffic generated for a cultural center."

122. Although unnecessary, Father Charron volunteered to fundraise to "pay for any road infrastructure" needed to ensure that Ridge Road would be safe to use.

123. Mr. Haydo's testimony and Fr. Charron's assurances squarely addressed the Township's concerns, and the Township had no contrary evidence before it.

124. Moreover, the Township appears to have had no such concerns when approving the Carpenters Complex, which can also only be accessed via Ridge Road.

125. The Carpenters Complex attracts many daily users and hosts large events, such as political rallies. The traffic along Ridge Road thus already experiences daily traffic as well as periods of increased traffic caused by large events at the Carpenters Complex.

126. Despite the already existing uses of Ridge Road, the PDA, and the Church's cooperation, the Township used traffic concerns as yet another pretext to prevent the Church from building its Shrine Project or Chapel Project on its Property.

127. The Township's concern that the Property was "not the right location" for the Church's Shrine Project was purportedly born out of concerns about traffic management and road safety. But neither concern is compelling.

128. As to traffic, the only experts who evaluated the Church's potential impact on traffic concluded that it would be minimal.

129. As to road safety, the Township allowed the construction of hundreds of homes and the large Carpenters Complex while neglecting Ridge Road. In contrast, the Church offered to improve the road conditions leading up to the Church's Property.

130. All of the concerns the Township expressed to justify denying the Church's plans—noise, road safety, traffic, and location—fail the requirements of RLUIPA and the First Amendment. The Township cannot show and did not attempt to show compelling interests associated with its "concerns." It cited no evidence, testimony, or findings of fact to support its "concerns."

131. The Township's concerns are pretexts to prevent the Church from building on its own Property, and at best, the concerns fall short of the "compelling interest" required by law.

**C. No Least Restrictive Means**

132. The Township's zoning ordinances, which prevent churches from operating anywhere as of right, are about the most restrictive measures the Township could have employed. Its overbroad restrictions on religious activity are not narrowly tailored to any interest.

133. The Township's full rejection of the Shrine Project and then imposition of numerous conditions on the Chapel Project are also not the least restrictive means of achieving any compelling interest, even if one existed. Instead, the conditions are arbitrary, invasive, and highly restrictive.

134. The conditions prevent the Church from holding a memorial service for anyone who died before June 9, 2025. The Township never provided a reason for this

condition or the specific date. Why not June 8, 2025? Why not June 7? This condition is arbitrarily restrictive and prevents the Church from properly honoring the dead in line with its faith.

135. The conditions prevent the Church from ringing its bells for longer than 3.5 minutes. Why not four minutes? Why not 3.75? Again, the Township provided no justification for this specific time limit or why the Church could not ring the bells for longer periods, which it must do in the practice of liturgical traditions.

136. The conditions prevent the Church from ringing its bells outside of funeral or memorial services. So, the Church could not ring its bells to remind followers to pray, to recognize holy days, or to commemorate the daily 3:00 p.m. Hour of Mercy. The Township did not explain why funeral or memorial services were the only permissible times for bell-ringing.

137. Despite the Township never identifying a compelling governmental interest or attempting to fashion the least restrictive means, the Church proposed solutions to resolve the Township's questions and concerns.

138. These efforts include numerous e-mails, phone calls, and public meetings, as well as specific concessions and offers, such as building and maintaining a park in a nearby neighborhood, volunteering to raise funds for any road infrastructure or repair, providing an example of the bell chimes, committing to bell-ringing within ordinance guidelines, committing to bell-ringing that would mirror the frequency and decibel levels of other Catholic cemeteries in the Township, offering to forego daily 3:00 p.m. bell-ringing.

139. As part of these concessions and offers, the Church eventually submitted a significantly scaled-down project that was a shell of the original Shrine Project. But even for the Chapel Project, the Township imposed numerous restrictions, none of which were based on any findings or could be demonstrated to be the least restrictive means of furthering a compelling interest.

## CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 2000cc *et seq.*
### Violation Of The Religious Land Use And Institutionalized Persons Act—Substantial Burden On Religious Exercise By A Land Use Regulation That Does Not Further A Compelling Government Interest In The Least Restrictive Means

140. The Church realleges all matters set forth above and incorporates them here by reference.

141. RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates" that such imposition is both "(A) [ ] in furtherance of a compelling governmental interest; and (B) [ ] the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1).

142. RLUIPA's definition of "government" includes "(i) a State, county, municipality, or other governmental entity created under the authority of a State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law." *Id.* § 2000cc-5(4). RLUIPA thus covers the actions of the Township and its Board of Commissioners.

143. RLUIPA defines "religious exercise" to include "[t]he use . . . of real property for the purpose of religious exercise," *id.* § 2000cc-5(7)(B), and defines a covered "land use regulation" to include "a zoning . . . law, or the application of such a law, that limits or restricts a claimant's use . . . of land," *id.* § 2000cc-5(5).

144. RLUIPA thus establishes a strict scrutiny standard for a municipality's implementation of land use regulations (like a zoning ordinance) that substantially burden a religious institution's use of its real property for purposes of religious exercise.

145. The Township's zoning ordinances are "land use regulation[s]" within RLUIPA, as they are "a zoning . . . law" that "limits or restricts" how the Church may "use" its "land." *Id.* § 2000cc-5(5).

146. The Church is a "religious assembly or institution" protected by RLUIPA, *id.* § 2000cc(a)(1), that is entitled to raise RLUIPA claims in court, *id.* § 2000cc-5(1), as it is an Eastern Catholic Church.

147. The Church's proposed plan to build a cultural center and shrine on its land constitutes a protected "religious exercise" under RLUIPA, *id.* § 2000cc(a)(1), as it involves the "use" of the Church's "real property for the purpose of religious exercise," *id.* § 2000cc-5(7)(B).

148. With its plans to build a religious and cultural center on its land, the Church is using its real property to practice its religious heritage and traditions because of the Church's sincerely held religious beliefs.

149. RLUIPA thus applies. But the Township failed to meet its basic obligations under RLUIPA.

150. The Township's zoning ordinances are a substantial burden on the Church because the ordinances deny the Church the opportunity to open and operate the Shrine or Chapel Projects anywhere in the Township as of right. Instead, the Church must get a conditional use approval from the Township, and experience has shown the Township's lack of amenability in the zoning process. At best, the Church would have to hurdle the Township's obstruction and derision to gain its permission. The Township's ordinances are the exact sort of significant restrictions on religious activity that RLUIPA forbids.

151. Next, the Township imposed substantial burdens by denying the Church's Shrine Project and then imposing severe restrictions on the Chapel Project. These actions unduly burdened the Church's ability to practice its sincerely held religious beliefs. Below are the particularly egregious and arbitrary conditions imposed on the Chapel Project:

a. The Township prohibited the Church and its members from holding a memorial service for anyone who died before June 9, 2025. Remembering the dead is central to the Church's liturgical life, and this condition would prevent this fundamental tradition.

b. The Township limited the Church to ringing bells for only 3.5 minutes, and it restricted the Church to ringing bells only for funeral or memorial services. This condition ignores the long history and importance of ringing bells to the Church.

c. The Township limited the Church from using the proposed chapel for any gathering besides funeral or memorial services. Under the condition, Church members could not gather to simply pray.

d. The Township cut the maximum height of the chapel to 35 feet and shrunk the maximum size of the chapel to 5,000 square feet. The Township turned the Church's vision of a solemn and beautiful shrine into a small building that the Church may only use for funerals.

152. The next question is whether the Township identified a compelling governmental interest. It did not. In fact, it did not identify *any* interest it purported to advance. Even if the concerns expressed by the Township are interpreted charitably as "governmental interests," these interests are not compelling.

153. As to noise, the Property sits in the flight path of the Airport and just below Interstate 376. The noise produced by church bells would pale in comparison to the constant hum of highway traffic and the roar of commercial airliners flying above.

154. As to traffic and road safety, the Township has permitted the construction of a roughly 200-home development and a 93,000-square-foot Carpenters Complex, which can only be accessed via Ridge Road. Additionally, the Church commissioned its own study, and the only expert who spoke on the issue concluded that traffic impacts would be minimal.

155. Finally, the Township must have used the least restrictive means. It did not. The Township's conditions were highly restrictive. Without explanation or

justification, the conditions prevent the Church from holding a memorial service before an arbitrary date, prevent bell-ringing beyond an arbitrary duration, and prohibit bell-ringing outside a narrow and arbitrary set of services. These arbitrary and highly restrictive conditions represent the exact kind of municipal overreach that RLUIPA was intended to prevent.

156. The Township entirely failed to consider its obligations under RLUIPA. The Township gathered no evidence and made no findings concerning the burden on the Church flowing from its rejection of the Shrine Project and from the conditions it imposed on the Chapel Project. The Township similarly failed to identify any compelling governmental interest in denying the Church's proposed uses of its own property, consider whether any of these restrictions served a compelling governmental interest, or consider whether these restrictions were the least restrictive means available to advance any purported governmental interest.

157. For all these reasons, the Township's actions and its conditions imposed upon the Church violate the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.*, by creating a substantial burden on the Church's religious exercise through the application of its land use regulation in a manner that does not further a compelling government interest in the least-restrictive means.

158. As a direct and proximate result of the Township's conduct, the Church has suffered and will continue to suffer irreparable harm, including the loss of its statutory and constitutional rights, entitling it to declaratory and injunctive relief, nominal damages, and attorneys' fees.

**COUNT II**
**42 U.S.C. § 2000cc *et seq.***
**Violation Of The Religious Land Use And Institutionalized Persons Act—Treatment Of A Religious Assembly Or Institution On Less Than Equal Terms**

159. The Church realleges all matters set forth above and incorporates them here by reference.

160. RLUIPA's equal-terms provision provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." *Id.* § 2000cc(b)(1).

161. The Township's zoning ordinances violate RLUIPA's equal-terms provision by treating the Church's religious land use on less-than-equal terms than nonreligious institutions on their face.

162. The Township's zoning ordinances permit commercial schools like the Carpenters Complex to exist and operate as a matter of right within the PEDD zones. Twp. of Collier, Pa., Mun. Code § 27-1602.1. They also permit businesses and professional offices—including major offices that are over 10,000 square feet, *id.* § 27-202 Business or Professional Office—along with health clubs and a variety of private, public, and commercial recreational uses—including amusement parks, amphitheaters, fitness centers, ice or roller rinks, and country clubs, *id.* § 27-202 Recreation, Commercial, Recreation, Private, Recreation, Public—to exist and operate as a matter of right within the PEDD zones. *Id.* § 27-1602.1.

163. However, the ordinances prohibit churches and other religious institutions from operating in the PEDD zones at all. *Id.* § 27, Attachment 9, Use

Table. Indeed, the only potentially religious land use contemplated by the Township in the PEDD zones is the operation of a cemetery, but even that use is not allowed as a matter of right and is instead subject to conditional use approval from the Township. *Id.* § 27-1602.1–.2.

164. The Township's purpose of the PEDD zones is "to promote economic development on large undeveloped tracts in a campus-style atmosphere, allowing for a compatible mix of uses that encourages an integrated living and working environment while preserving adequate buffers between dissimilar uses." *Id.* § 27-1601.

165. The establishment of a church campus, including memorials or cemeteries, is comparable to the establishment of campuses of commercial schools, business and professional offices, health clubs, and the various recreational uses permitted in the PEDD zones regarding the PEDD ordinances' stated objective of establishing a "campus-style atmosphere" that allows a "mix of uses that encourages an integrated living and working environment." *See id.*

166. More broadly, the Township does not permit churches or other religious land uses in *any* of its districts as a matter of right and instead requires all religious land use to obtain conditional use approval from the Township. *Id.* § 27, Attachment 9, Use Table.

167. Notwithstanding these restraints on churches, the Township allows for comparable secular uses such as commercial schools, minor and major business and professional offices, health clubs, a variety of recreational uses, indoor entertainment

venues, and restaurants to exist as a matter of right in at least one of the Township's zoning districts. *See id.*

168. Thus, the Township's zoning ordinances, including its PEDD ordinances, facially violate RLUIPA's equal terms provision.

169. The Township's application of its zoning ordinances to the Church's Shrine and Chapel Project also violates RLUIPA's equal terms provision, given the Township's treatment of the nearby Carpenters Training Center Complex. 42 U.S.C. § 2000cc(b)(1).

170. The Church's Shrine and Chapel Projects and the Carpenters Complex share important traits. Both occupy land designated as PEDD zones. Both are accessible only through Ridge Road. Both seek to establish campuses that host gatherings that are open to their members and the public. In essence, both uses seek to advance the Township's stated purpose of "promot[ing] economic development on large undeveloped tracts in a campus-style atmosphere" and "encourag[ing] an integrated living and working environment while preserving adequate buffers between dissimilar uses." Twp. of Collier, Pa., Mun. Code § 27-1601.

171. Yet the differences in the Township's treatment of the Carpenters Complex are striking. The Carpenters Complex is nearly 93,000 square feet and contains around 300 parking spaces. It is used near-daily for secular gatherings and is also used for large events, such as political rallies, without being subjected to any of the restrictions imposed on the Church.

172. In contrast, the Township categorically prohibited the Shrine Project from operating on the Church's property and imposed stringent conditions on the Chapel Project that prohibited a variety of religious activities and arbitrarily curtailed the size of the Chapel to 5,000 square feet (about 5% of the size of the Carpenters Complex) and no more than 35 feet high.

173. The Township has not imposed similar limitations on the Carpenters Complex's educational or commercial activities in its building, which is significantly larger than either the Shrine or Chapel. Indeed, since forcing the Church to downsize the scope of its project to something unrecognizable from the original plans before ultimately and arbitrarily denying or vastly limiting the Church's requested Projects, the Township has been in the process of approving a zoning variance to allow the Carpenters Complex to increase the size of its already significant footprint by building a tall training structure on its already sprawling compound. This is no minor addition, as records indicate that the project includes "cutting into the hillside." Yet public records show no comments or reservations concerning noise, traffic, or aesthetics.

174. Additionally, in an effort to advance the City's purported interests in the PEDD zones, the Church has proposed building a nearby public park and improving the conditions of Ridge Road leading to the Church's Property. On information and belief, the Carpenters Complex has proposed to do nothing of the sort for the community.

175. The Township's treatment of the Carpenters Complex and its zoning variance contrasts dramatically with its treatment of the Church, and the Township lacks any legitimate regulatory purpose for doing so.

176. Moreover, the Township's treatment of the Church has been influenced by vocal community members, whose loud opposition to the Church's proposals smacked of hostility to the Church's religious beliefs and identity. Chairman Chiurazzi himself derided Father Charron's comment that God's providence would help the Church finance the project. From public meetings to routine interactions with Township leadership, the lack of respect toward the Church was clear.

177. Despite the Township's ordinances and conditions on the Church, the Township allows Hill City Church to operate in a PEDD zone. Hill City Church offers religious worship services at this property, suggesting that the Township did not impose the same arbitrary conditions on Hill City Church that it imposed on the Church.

178. For all these reasons, the Township's conduct toward and conditions imposed upon the Church violate the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.*, by treating the Church on less than equal terms with nearby, similarly situated secular institutions.

179. As a direct and proximate result of the Township's conduct, the Church has suffered and will continue to suffer irreparable harm, including the loss of its statutory and constitutional rights, entitling it to declaratory and injunctive relief, nominal damages, and attorneys' fees.

**COUNT III**
**42 U.S.C. § 1983**
**Violation Of U.S. Constitutional Amendment I**
**Free Exercise Clause – Substantial Burden On Free Exercise**

180. The Church realleges all matters set forth above and incorporates them here by reference.

181. The Free Exercise Clause of the First Amendment, incorporated against the States by the Fourteenth Amendment, mandates that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I.

182. Under the Supreme Court's existing Free Exercise Clause doctrine—beginning with the Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990)—the Supreme Court has held that a law that burdens the free exercise of religion is subject to strict scrutiny, except if the law is *both* neutral and generally applicable.

183. While recognizing that this Court is bound by the legal framework established by *Smith* and its progeny, the Church expressly preserves the argument that the Supreme Court should partially overrule *Smith* and apply strict scrutiny to neutral laws of general applicability that burden a church's religious use of its property. Each of the Supreme Court's factors for overruling prior decisions weigh in favor of overruling *Smith* as it applies to neutral and generally applicable laws that burden a church's religious use of its property: the decision plainly failed to respect the Supreme Court's precedents, was mistaken as a matter of the Constitution's original public meaning, and has proven unworkable in practice, with subsequent

developments only serving to further weaken its already flimsy reasoning. *See Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 585 U.S. 878, 917 (2018).

### A. The Application of the Township's Ordinances Was Neither Neutral Nor Generally Applicable, So Strict Scrutiny Should Apply

184. The Township's application of its ordinances subjects its conduct to strict scrutiny because it was neither neutral nor generally applicable.

185. To be neutral, a law's purpose must be something other than the infringement or restriction of religious practices. Thus, the government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).

186. To be generally applicable, a law must not prohibit religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way. *See Fulton v. City of Phila.*, 593 U.S. 522, 534 (2021).

187. Additionally, government actions are neither neutral nor generally applicable "whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (emphasis in original).

#### 1. The Application Was Not Neutral

188. The Township's claimed interests were pretextual. "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Church of Lukumi*, 508 U.S. at 534. Instead, the Township's claimed "secular purpose [ ] has to be genuine, not a

sham, and not merely secondary to a religious objective." *McCreary Cnty., Ky. v. Am. C.L. Union of Ky.*, 545 U.S. 844, 864 (2005).

189. The Township has subjected the Church to "distinctive treatment," *Church of Lukumi*, 508 U.S. at 534, and it has not provided any "genuine" "secular purpose" justifying the application of its regulations to the Church, *McCreary*, 545 U.S. at 864. Its actions were thus not neutral.

**2. The Application Was Not Generally Applicable**

190. The Township does not permit churches or other religious land uses in *any* of its zoning districts as a matter of right and instead requires all religious land use to obtain conditional use approval from the Township. *See* Twp. of Collier, Pa., Mun. Code § 27, Attachment 9, Use Table.

191. In contrast, the Township allows comparable secular uses, like commercial schools, business and professional offices, health clubs, a variety of recreational uses, indoor entertainment venues, and restaurants, to exist as a matter of right in at least one of the Township's Zoning Districts.

192. Specifically, within PEDD zones, the Township allows commercial schools, business and professional campuses, amusement parks, amphitheaters, fitness centers, ice or roller rinks, and country clubs to operate as a matter of right, while it prohibits all churches and requires religious cemeteries to obtain conditional use approval from the Township. *Id.* § 27-1602.1–.2.

193. The Free Exercise Clause prohibits such favoritism for only the Township's favored comparable secular activities and subjects such favoritism to strict scrutiny.

194. Likewise, the Township's application of its zoning ordinances to the Church's Shrine and Chapel Projects has unduly burdened the Church's religious exercise, also triggering strict scrutiny.

195. The Township used its ordinances to categorically prohibit the Church from building the Shrine Project on its Property. It then imposed strict conditions on the scaled-down Chapel Project, prohibiting the Church from gathering for any non-funeral service, broadly restricting bell-ringing, and arbitrarily limiting the size of the Chapel to 5,000 square feet and a height of no more than 35 feet. These actions are neither neutral nor generally applicable.

196. The Township has not imposed similar limitations on the Carpenters Complex's educational or commercial activities, and the Carpenters Complex is significantly larger than the Shrine or Chapel Projects. Indeed, since denying or curtailing the Church's proposals, the Township has been in the process of approving a zoning variance to allow the Carpenters Complex to build yet more tall training structures. Allowing the Carpenters Complex to engage in comparable secular activities while prohibiting and restricting the Church's religious activities is neither neutral nor generally applicable.

197. Additionally, the Township's application of its ordinances to specifically limit what religious activities may take place within the Chapel is an application that applies *only* to the Church, governing land uses on the Church's Property.

198. These ordinances do not create a uniform standard applying to all gatherings in the Township or even within the PEDD zones.

199. The Township's application of its ordinances to the Church, therefore, does not constitute the enforcement of a generally applicable zoning code that applies to properties elsewhere in the Township.

200. Thus, the challenged ordinances are not generally applicable under the Free Exercise Clause and are therefore subject to strict scrutiny.

201. The Township's actions can survive strict scrutiny only if they advance "interests of the highest order" and are narrowly tailored to achieve those interests. *Church of Lukumi*, 508 U.S. at 546 (internal quotations omitted). Or "[p]ut another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541.

### 3. The Township's Actions Fail Strict Scrutiny

202. The Township's application of its zoning ordinances triggers strict scrutiny even under existing Supreme Court doctrine, as the Township's ordinances are not generally applicable.

203. The Township's application of its ordinances also triggers strict scrutiny if the Supreme Court partially overrules *Smith*, 494 U.S. 872, and applies strict scrutiny as to neutral laws of generally applicability that substantially burden a

church's use of its property to care for its faithful—an argument that the Church expressly preserves here.

204. Additionally, the Township's application of its ordinances to specifically limit what religious activities may take place within the Chapel is an application that applies only to the Church, governing land uses on the Church's Property.

205. These ordinances do not create a uniform standard applying to all gatherings in the Township or even within the PEDD zones.

206. The Township's application of its ordinances to the Church, therefore, does not constitute the enforcement of a generally applicable zoning code that applies to properties elsewhere in the Township.

207. Thus, the challenged ordinances are not generally applicable under the Free Exercise Clause and are therefore subject to strict scrutiny.

208. The Township's actions can survive strict scrutiny only if they advance "interests of the highest order" and are narrowly tailored to achieve those interests. *Church of Lukumi*, 508 U.S. at 546 (internal quotations omitted). Or "[p]ut another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541.

209. Here, the Township has identified no compelling government interest furthered by the application of its ordinances to restrict the Church's use of its Property to care for its faithful. The Township's purported interests in noise and traffic management are not compelling, as the Township has failed to vigorously protect those interests—it allows noise louder than any bells would produce, and it

allows the Carpenters Complex to create more traffic than the Shrine or Chapel Projects would. *See Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 486 (2020) (holding a "fatally underinclusive" law failed to satisfy strict scrutiny).

210. Even assuming the Township did have compelling government interests, its wholesale denial of the Shrine Project and its arbitrary limitations on the Chapel Project are not narrowly tailored to achieve those interests. *See Fulton*, 593 U.S. at 541 ("[S]o long as the government can achieve its interests in a manner that does not burden religious, it must do so.").

**B. The Township Fails Even Rational Basis Review**

211. The Township's application of its ordinances to limit the Church's construction of a religious center on its property violates the Free Exercise Clause under any applicable level of scrutiny, even the lower-level scrutiny that applies to neutral laws of general applicability under existing Supreme Court precedent.

212. If a law is neutral and generally applicable, then courts review that law for compliance with the Free Exercise Clause under rational basis review.

213. The Township can have no plausible reason for applying its ordinances to bar the Church's construction of a religious center. The center would allow individuals to practice their faith and grieve with those who share their faith. For members of the Ukrainian Greek Catholic Church, these essential religious services are found nowhere else in the community, underscoring the irrationality of the Township's restrictions on the Church's religious exercise.

214. The Township cannot show that prohibiting the Church's construction of a religious center on its property furthers any legitimate interest in the health, safety, or welfare of the citizens of the Township. On the contrary, the Church's center would further the health, safety, and welfare of the Township by providing a dignified space for members of the Ukrainian Greek Catholic Church to practice their faith and grieve with those who share their faith.

215. For all these reasons, the Township's restrictions on the Church's construction of a religious center on its property violate the Free Exercise Clause of the First Amendment of the Constitution by imposing a substantial burden on the Church's free exercise of religion without any lawful justification.

216. As a direct and proximate result of the Township's conduct, the Church has suffered and will continue to suffer irreparable harm, including the loss of its statutory and constitutional rights, entitling it to declaratory and injunctive relief, nominal damages, and attorneys' fees.

**COUNT IV**
**42 U.S.C. § 1983**
**Violation Of U.S. Constitutional Amendment I**
**Establishment Clause**

217. The Church realleges all matters set forth above and incorporates them here by reference.

218. The Establishment Clause of the First Amendment, made applicable to the States through the Fourteenth Amendment, restricts "law[s] respecting an establishment of religion." U.S. Const. amend. I.

219. As part of its restriction on the official establishment of religion, the Constitution necessarily prohibits states from meddling in the internal affairs of houses of worship. Whether the discrete issue is personnel and hiring matters, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020), disputes over church property, *Jones v. Wolf*, 443 U.S. 595 (1979), or policing the boundary between orthodoxy and heresy, *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871), houses of worship are autonomous within their sphere.

220. Defendants' application of its zoning ordinances implicates the very core of a religious group's activities—worship and religious activities on church property. A church's authority over who may enter the sanctuary, under what circumstances, and as to which prayers and other religious activities may take place lies at the very heart of "the general principle of church autonomy" protected by the Establishment Clause. *Our Lady of Guadalupe*, 591 U.S. at 747.

221. Accordingly, absent a longstanding historical tradition of restrictions on churches or the construction of religious institutions like the Church's proposed religious center, the Township's prohibition on the Church's planned construction is plainly unconstitutional. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 533–36 (2022) (instructing that "the Establishment Clause must be interpreted by reference to historical practices and understandings" and collecting cases (citation omitted)).

222. No history or tradition justifies the Township's intrusion into the Church's Property to dictate which portions of the Church's Property may be used for religious purposes or how the Church may go about accomplishing its religious

mission. More generally, the Establishment Clause of the First Amendment, made applicable to the States through the Fourteenth Amendment, prohibits governmental hostility to religion.

223. As a direct and proximate result of the Township's conduct, the Church has suffered and will continue to suffer irreparable harm, including the loss of its statutory and constitutional rights, entitling it to declaratory and injunctive relief, nominal damages, and attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, the Church requests that the Court:

(1) Declare that Defendants' actions against the Church and the Defendants' application of the Township's zoning ordinances violated the Church's protected "religious exercise" rights under RLUIPA, 42 U.S.C. § 2000cc(a)(1);

(2) Declare that Defendants' actions against the Church and the Defendants' application of the Township's zoning ordinances constitute treatment of a religious assembly or institution on less than equal terms under RLUIPA, 42 U.S.C. § 2000cc(b)(1);

(3) Declare that Defendants' actions against the Church and the Defendants' application of the Township's zoning ordinances violated the Church's protected "free exercise" of "religion" rights under the Free Exercise Clause, U.S. Const. amend. I;

(4) Declare that Defendants' actions against the Church and the Defendants' application of the Township's zoning ordinances constitute hostility to religion in violation of the Establishment Clause, U.S. Const. amend. I;

(5) Issue preliminary and permanent injunctive relief prohibiting Defendant from infringing on the Church's protected religious exercise under RLUIPA, the Free Exercise Clause, and/or the Establishment Clause, including the Church's construction of the Shrine Project, Chapel Project, or any project on the Church's Property that satisfies RLUIPA's standards;

(6) Award nominal damages in the amount of $1.00 against Defendants;

(7) Award the Church reasonable attorneys' fees and costs, including under 42 U.S.C. § 1988; and

(8) Award all such other relief as the Court may deem proper.

**JURY DEMAND**

The Church demands a trial by jury of all issues so triable.

Dated: January 7, 2026.

Respectfully submitted,

DAVID J. HACKER*
JEREMIAH G. DYS*
RYAN GARDNER*
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway
Suite 1600
Plano, TX 75075
Tel: (972) 941-4444
DHacker@firstliberty.org
JDys@firstliberty.org
RGardner@firstliberty.org

MADISON M. KRAUSE
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. NW
Suite 1410
Washington, DC 20004
(972) 941-4444
MadisonKrause@firstliberty.org

*/s/ Randall L. Wenger*
RANDALL L. WENGER
JEREMY SAMEK
INDEPENDENCE LAW CENTER
23 N. Front St.
Harrisburg, PA 17101
(717) 657-4990
rwenger@indlawcenter.org
jsamek@indlawcenter.org

JOSHUA D. DAVEY*
*Counsel of Record*
TROUTMAN PEPPER LOCKE LLP
301 S. College St., 34th Floor
Charlotte, NC 28202
(704) 916-1503
joshua.davey@troutman.com

M. TAYLOR LEVESQUE*
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
(214) 740-8397
taylor.levesque@troutman.com

DYLAN J. DEWITT*
NICK GOUVERNEUR*
111 South Wacker Drive, Suite 4100
Chicago, IL 60606
(312) 759-1602 (DD)
(312) 759-3655 (NG)
dylan.dewitt@troutman.com
nick.gouverneur@troutman.com

BRADLEY A. SMUTEK*
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103
(215) 981-4002
brad.smutek@troutman.com

*Attorneys for Holy Trinity Ukrainian Catholic Church*

**pro hac vice* application forthcoming

**VERIFICATION**

1. My name is Father Jason Charron. I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise capable of making this verification.

2. I am the pastor of Holy Trinity Ukrainian Catholic Church in Collier Township, Pennsylvania (the "Church").

3. I have read the factual statements contained in the Verified Complaint of Plaintiff Holy Trinity Ukrainian Catholic Church (the "Complaint").

4. Based on my role as pastor of the Church, I have personal knowledge of and experience with the events described in the Complaint.

5. I swear that the factual statements in the Complaint are true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 6, 2026.

Father Jason Charron